HORTENSIA RIVERA DAMIANI, Plaintiff and Appellant, *v.* EMILIO FAGOT, JR., Defendant and Appellee.

No. 10360. Argued March 9, 1951.—Decided June 29, 1956.

*Inés Acevedo de Campos* and *Rafael Muñoz Ramos* for appellant.
*Raúl Matos* and *Jaime A. García Blanco* for appellee.

Mr. Justice Negrón Fernández delivered the opinion of the Court.

This is an action for damages brought by Hortensia Rivera Damiani against Emilio Fagot, Jr. for an alleged breach of promise of marriage. The averments of the complaint may be summed up as follows: On December 23, 1947, and as a result of the love relations between them, the defendant and plaintiff agreed to marry. On that same day they announced their engagement at plaintiff's residence in Guayanilla and obtained the consent of plaintiff's parents, as is usual and customary. Plaintiff at the time was of age, single, and a student in the University of Puerto Rico; the defendant was also of age, a widower, and proprietor, so that they were both competent to contract marriage, there being no legal impediment to marry each other. The love relations between plaintiff and defendant continued until the time of the wedding and at defendant's behest she gave up her studies in the University so she could be "near him with greater

devotion to their love, since their marriage was to take place soon." The defendant, without any reason or motive and while still engaged to plaintiff, broke his promise, and on October 11, 1948 married in Ponce another girl, who is now his wife. Plaintiff was at all times willing to keep her promise to the defendant, and she always told him so—the last time, three or four days before he was married.

In view of defendant's action, plaintiff alleged that she suffered damages estimated at $15,000, on the following accounts: (1) moral suffering, mental anguish, impairment of health, pain, mortification, mental anxiety, humiliation before her acquaintances, friends, and family; (2) damage to her reputation before society; (3) failure in her studies and prospects in life, and (4) failure in her economic expectancy based on the prospective marriage to the defendant, who was a person of solvent means.

The defendant moved for dismissal of the complaint alleging that it did not state facts sufficient to constitute a cause of action against him. The motion was dismissed after a hearing before one of the judges of the lower court. The defendant then answered denying specifically the essential facts of the complaint, alleging on the contrary other facts, and reproducing, by way of special defense,[1] his averment of lack of facts to constitute a cause of action, alleging that the action brought "does not exist in the civil legislation of Puerto Rico and it is not contemplated by § 1802 of the Civil Code, 1930 ed."

---

[1] That special defense was argued prior to the trial before another judge of the lower court, who also dismissed the latter "without prejudice to whatever view the presiding judge may take after reading the case of *Claparols* v. *De Castro*, decided by the Court of First Instance for the District of Manila, Philippine Is., reported in 43 Am. L. Rev. 759, which we have been unable to secure despite our great efforts." As will be seen from the legal grounds on which the dismissal was based, after the trial the judge rectified his previous view.

After a trial on the merits, the court dismissed the complaint and based its decision on the conclusions of law [2] which may be summed up as follows:

(1) The action for damages for breach of promise of marriage is not authorized by our Civil Code, since by the nonadoption of §§ 43 and 44 of the Spanish Civil Code the legislative intent was to abolish such action completely.

(2) That the action for damages for breach of promise of marriage does not lie either under the general contract laws or under § 1054 of our Civil Code.

(3) Even assuming that the promise of marriage were a contract, a claim for damages will be limited to the expenses incurred by her for the marriage ceremony, since damages for the suffering caused by mental anguish as a result of such breach are not recoverable.

---

[2] The court made, among others, the following findings of fact:

"That plaintiff and defendant maintained love relations for some time, and on or about December 23, 1947, the defendant and plaintiff agreed to marry and they so announced it to plaintiff's parents. Both plaintiff and her parents accepted defendant's promise to marry.

"That the defendant courted plaintiff some time in November 1947, while she was pursuing studies in the University of Puerto Rico, and from that date until the engagement he paid occasional visits to her in Santurce, Puerto Rico.

"That three months more or less after the engagement, the defendant wrote to plaintiff's father notifying him that the engagement was broken because of incompatibility of character.

"That during the courtship the defendant gave plaintiff the following presents:

| | |
|---|---|
| Wedding ring | $325 |
| A watch | 100 |
| Clothing and material for dresses, over | 100 |
| Bracelets and earrings | 25 |
| Shoes and perfume ............ $25 to | 50 |

"That after breaking the engagement to marry plaintiff, the defendant married his present wife.

"That after plaintiff discontinued her studies in the University of Puerto Rico, she continued the same in Percy School of Ponce.

"That as a result of defendant's breach of promise to marry, plaintiff has suffered moral anguish, mortification, and mental anxiety.

"That plaintiff pursued University studies during one semester."

Plaintiff assigned as error the dismissal of the complaint for lack of cause of action, and contends on appeal that §§ 43 and 44 of the Spanish Civil Code did not *create* a cause of action for damages for breach of promise of marriage, but rather *limited* the same; and that since those sections were not incorporated into our 1902 Revised Civil Code, such limitation is nonexistent and the action lies under the authority of § 1054 of our Civil Code, in connection with §§ 1042, 1043, and 1044 of that Code.

Appellant sums up in her brief the grounds of her contentions as follows:

"The action brought by plaintiff is predicated on § 1054 of the Civil Code, which is an action for damages for nonperformance of an obligation violated by the appellee, regardless of how he did it. The obligation consists of his promise to marry plaintiff. Such a promise creates an obligation which arises from the contract made by both, which affirmation falls squarely within the scope of § 1054 *supra.* It is not an action predicated on § 1802, since it is not an ACT OR OMISSION RESULTING FROM FAULT OR NEGLIGENCE, WHICH CREATES AN OBLIGATION WHICH DID NOT EXIST THERETOFORE. Section 1802 of the Civil Code, which is equivalent to § 1902 of the Spanish Civil Code, is distinguishable from § 1054 in that under the latter an action for damages may be brought against those who in any manner fail to perform an EXISTING obligation, AS A CONDITION PRECEDENT, while under § 1802 such action may be brought as a result of fault or negligence which, WITHOUT THE EXISTENCE OF A PREVIOUS OBLIGATION and without any contractual relation, produces an injury or prejudice originating from an unlawful act." (See XII Manresa, *Comentarios al Art. 1902,* p. 633 *et seq.*)

The appellee maintains, on his part, that the action for breach of promise of marriage is nonexistent, and that it is not recognized at all by our law, since the prevailing legislation contains no specific provision authorizing such an action, in view of the fact that §§ 43 and 44 of the Spanish Civil Code were not incorporated into our Civil Code; that

the promise of marriage is not a contract, and that an action for breach of promise can not be brought on the authority of provisions of a general character.

The Spanish Civil Code, which went into effect in Puerto Rico on January 1, 1890, or 20 days after it was published in the official Gazette on December 12, 1889 pursuant to Royal Decree of July 30 of that year, *Torres et al.* v. *Rubianes et al.*, 20 P.R.R. 316, provided in its §§ 43 and 44 the following:

"Art. 43. A mutual promise of marriage shall not give rise to an obligation to enter into the contract of marriage, and no court shall entertain any complaint by which the enforcement of such promise is sought.

"Art. 44. If the promise has been made in a public or private instrument by an adult, or by a minor in the presence of the person whose consent is necessary for the celebration of the marriage, or when the banns have been published, the one who without just cause refuses to marry shall be obliged to reimburse the other for the expenses which he or she may have incurred by reason of the promised marriage.

"The action for reimbursement of expenses to which the foregoing article refers must be brought within one year, computed from the day of the refusal to celebrate the marriage."

The foregoing provisions were omitted from our positive law when the Revised Civil Code went into effect on July 1, 1902.

Does the absence of those provisions mean, as maintained by appellant, that the promise of marriage should be governed in general by the same rules of our Civil Code as ordinary contracts, and that, therefore, its nonperformance produces the juridical consequences provided by § 1054 [3] on which she bases her claim for damages? Or does the absence of those provisions mean, as maintained by the appellee, that

---

[3] Section 1054: "Those who in fulfilling their obligations are guilty of fraud, negligence, or delay, and those who in any manner whatsoever act in contravention of the stipulations of the same, shall be subject to indemnify for the losses and damages caused thereby."

530

our Code does not authorize any action to recover damages caused by the faulty breach of such promise?

I

■ Betrothal—mutual promise to marry in the future —the origin of which, as an antenuptial requirement, is traceable to Greek law,[4] develops in the Roman law,[5] and acquires particular significance in canon law.[6] In the old Spanish law, it appears in the *Fuero Juzgo*, the *Fuero Real*, and the *Siete Partidas*.[7] Under the last of these laws the betrothal created the obligation to marry,[8] enforceable in certain cases by filing an action for specific performance in

---

[4] E. Menéndez, *El Matrimonio*, p. 57: "The Greeks were the first to establish the betrothal as an antenuptial requirement, together with what is known today as 'arras' (betrothal gifts). By the *arrae sponsalitiae*, one who promised marriage compelled its celebration by delivering an amount to the other party, which kept it as its own in the event the marriage was called off, as a civil penalty for a breach of promise and in detriment to the offending party."

[5] 2 Von Mayr, *Historia del Derecho Romano* (translation by W. Roces), p. 10; 2 Puig Peña, *Derecho Civil*, Vol. 1, p. 68, footnote 3; 2 Scaevola, *Código Civil*, p. 323; Radin on *Roman Law*, p. 114 *et seq;* 1 Manresa, *Comentarios al Código Civil Español*, p. 331: "Among the Romans, although the betrothal did not create an obligation enforceable at law, the betrothed who gave *arræ* forfeited the same by his refusal to contract marriage, for the benefit of the other party who insisted on living up to his promises (Laws 3, 5, and 6, Tit. 1, Book 5 of the Code)."

[6] Marceliano Isábal, *Esponsales*, in 14 *Enciclopedia Jurídica Española*, p. 918 *et seq.;* Manuel Jiménez Fernández, *Esponsales*, in *Diccionario de Derecho Privado*, Vol. I, pp. 18, 21, *et seq.*

[7] In the *Fuero Juzgo:* Laws 2, 3, and 4, Tit. I, Book III; in the *Fuero Real:* Law 10, Tit. I, Book III; and in the *Partidas:* Laws 1, Tit. I, *Partida* 4. See Manresa, *op. cit.*, p. 331; Scaevola, *op. cit.*, p. 323, 2 Clemente de Diego, *Instituciones de Derecho Civil*, p. 355; 1 Benito Gutiérrez, *Código o Estudios Fundamentales sobre el Derecho Civil Español* (2d ed. 1868), p. 231 *et seq.*

[8] The juridical effect of this obligation, says Sánchez Román, "is purely theoretical, since neither the civil nor the canonical legislation, nor the civil or the ecclesiastical courts, have considered that they ought to require strict performance of this obligation to marry against the will of either of the contracting parties." 4 Sánchez Román, *Derecho Civil*, pp. 482, 483.

See, also, the commentary by Francisco de Cárdenas in his Introduction to Vol. I of Manresa, *Comentarios al Código Civil Español*, p. 25.

the ecclesiastical courts,[9] which had jurisdiction over the matter, as to its validity and rescission, the ordinary courts having jurisdiction as to the economic consequences of the damages or return of property.[10]  Betrothal, however, lost favor in the public opinion.[11]  The Spanish juridical critique advocated the abrogation of that institution.[12]

[9] At that time betrothal was regarded as a religious rather than a civil matter.  The undesirability of forced marriages brought about, as a cure to its evils, the Pragmatic of March 23, 1776 (Law 9, Tit. II, Book X, *Novísima Recopilación*), whereby the father's or mother's consent was necessary for the betrothal of their children, and later, the Pragmatic of April 1, 1803, whereby a betrothal was not valid unless executed in a public deed, and no complaints were admitted by ecclesiastical courts to enforce the betrothal contracted *without* such formality.

The civil marriage law of 1870 declared that the promise of future marriage would not create a civil obligation.  This law was in force, for that matter, only up to February 9, 1875, and after its repeal the betrothal, already in disfavor, gathered new life until the enactment of the Civil Code.  Marceliano Isábal, collaboration *supra*, p. 927; Puig Peña *op.* and *tit. cit.*, p. 72; Scaevola, *op. cit.*, p. 323; 3 Castán, *Derecho Civil, Común y Foral* (6th ed.), p. 465 *et seq.*

[10] Sánchez Román, *op. cit.* p. 484.

The Supreme Court of Spain recognized the action "for damages caused by one of the contracting parties by the *breach of a solemn marriage contract,*" considering "that the questions which arise concerning the *performance of a contract* made pursuant to law and to good usage must be decided in accordance with the agreement, because it is the principal law for the parties." (Italics ours.)  Judgments of January 13, 1879, 41 *Jurisprudencia Civil* 23, and January 21, 1881, 45 *Jurisprudencia Civil* 171.

[11] Clemente de Diego, *op.* and *tit. cit.*, p. 355: "The betrothal or engagement, handed down by tradition in our legal history (*Fuero Juzgo, Real, Partidas*, Pragmatics of March 23, 1776 and April 1, 1803), was the object of much scandal and therefore lost favor in the public opinion."

See, also, 2 Scaevola, *op. cit.*, p. 324.

[12] Benito Gutiérrez, *Códigos o Estudios Fundamentales sobre el Derecho Civil Español*, 2d ed. (1868), Vol. I, p. 222.  García Goyena, in *Concordancias, Motivos y Comentarios del Código Civil Español* (1852 ed.), Vol. I, p. 56, states as follows: "In the hands of a capable seducer, it is a weapon for combating the virtue of a passionate girl or one of inferior qualities;  in the hands of a crafty or unscrupulous woman, it will be a snare to entangle a man madly in love:  more than once the parents and tutors employed them to insure their combinations of interest, ambition, or vanity, engaging their minor children prematurely."

See citation made by Clemente de Diego, *op. cit.*, p. 355, of the view expressed in 1852 by Francisco de Cárdenas on the topic of betrothal, to the effect that "it was necessary to rid our law of a bad institution, somewhat in disfavor and disuse, but of serious inconvenience for the public interest and the welfare of the families."

## II

■ That is how the new declaration on betrothal contained in §§ 43 and 44 of the Civil Code came into the Spanish law. Some writers see in that form the principal characteristic of the precontract, although by the effect of those sections—which bar the action for specific performance —they refuse to admit that it has any relation with the preliminary contract.[13] In general, however, the doctrine classifies betrothal as one of the varieties of the contract of promise—prelude to marriage—which partakes of the characteristics of the family law as an institution and also of the ordinary law of contracts,[14] denoting it as "a lawful agreement of limited effects," [15] although the elimination of § 44 has been urged on the ground that it lacks legal efficacy.[16]

---

[13] José Alguer, *Para la Crítica del Concepto del Precontrato*, in 22 *Revista de Derecho Privado*, pp. 321, 375.

[14] 4 Sánchez Román, *op. cit.* p. 482; 3 Castán, *op. cit.* (6th ed.), p. 337; Puig Peña, *op. and tit. cit.*, pp. 69–70.

[15] 3 Castán, *op. cit.* (6th ed.), p. 337; 4 Valverde, *Tratado de Derecho Civil Español*, p. 75; Luis Muñoz, *Comentarios a los Códigos Civiles de España e Hispanoamérica* (1953), p. 106; Clemente de Diego, *op. and tit. cit.*, p. 355: "By its nature it is an agreement and, perhaps, even a contract accessory and preparatory to marriage, but which does not necessarily lead to it; it is an advanced representation of marriage, without the intensity or extent of effect of the latter."

Puig Peña parts from the theory that engagement is per se a *contract*. *Op. cit.*, pp. 69–70.

Juan Ríos Sarmiento, in his contribution "La Familia," in *Enciclopedia Práctica de Derecho*, Fenech (1952), p. 13, describes the promise of marriage as follows: "The Civil Code does not call it a contract but a promise; but, in fact, it is a contract, whether unilateral or bilateral."

In Italian law, see Rotondi, *Derecho Privado*, p. 548; R. Bruggi, *Instituciones de Derecho Civil*, p. 411 *et seq.*

[16] Comas, *La Revisión del Código Civil Español*, Vol. II, Special Part, pp. 134–135.

León Bonel y Sánchez, in *Código Civil Español*, Vol. I, p. 118, states as follows in relation to betrothal: "This promise, which at some time had force and when breached was punishable by the forfeiture of amounts, dowries for the wife, and in other ways which it would be tedious to enumerate here, has no longer any legal force, and all that may be said about it would be idle."

And Falcón in *Código Civil*, Vol. I, p. 83, says in his commentaries on § 44: "It is a new precept in our law, but not new in the law of

The provisions of the Spanish Civil Code leave no doubt, however, as to the propriety of the right of recovery of the expenses incurred for a promised marriage—not as to the compensation for damages— [17] founded on the alleged contractual nature of the betrothal.[18]

## III

▮▮▮ The present condition of our positive law is not propitious for treating the promise of marriage as if it were a legal contract.[19]   There is nothing in our Civil Code which would permit the mitigation of the rigor of the bare concept of the institution of the law of contracts which is necessary to create—without the aid of the family institution afforded by the Spanish Civil Code—the hybrid form of the Spanish betrothal contract of limited effects.   The contemporaneous Spanish legal doctrine bearing on the nature of betrothal—

other countries.   Some codes, like that of France and Holland, are silent on engagement.   Others, like that of Austria, Prussia, and Bavaria, recognize its validity when it is executed under certain conditions.   Others, like that of Portugal, regard it as null and void.   But even those codes which admit engagement do not recognize its validity except to compel the breacher of the promise to pay the damages caused by its nonperformance to the other party."

[17] 1 Martínez Ruiz, *Código Civil*, p. 260.

[18] Ortega Pardo, *La Ruptura de Esponsales en el Derecho Español Vigente*, in 177 *Revista General de Legislación y Jurisprudencia*, pp. 611, 614 *et seq.*

[19] In *Lara* v. *Ortega*, decided on July 6, 1905, by the United States District Court for Puerto Rico, a jury awarded damages for the breach in 1904 of a promise of marriage made in 1900, on instructions that the laws of Puerto Rico, like those of the United States, regarded a marriage contract as a civil contract; that an agreement to marry was considered, at law, as a contract, and that its nonperformance without justification gave rise to an action for damages, which was not limited to the mere recovery of expenses under the terms of § 44 of the Spanish Civil Code, even if it was in our legislation since July 1, 1902.

(The appeal from this judgment was dismissed for lack of jurisdiction by the United States Supreme Court in *Ortega* v. *Lara*, 202 U. S. 340, 50 L. Ed. 1055).

We are not bound, however, by the definition and scope which in the light of the rules of Anglo-American law, have been placed on our law by the federal court in that case.

which, we have seen, is based on express Code rules—cannot be assimilated to our law, which did not adopt those provisions.[20]

The situation of the Puerto Rican law is comparable to that of the French law,[21] whose Civil Code contains no provisions equivalent to those of §§ 43 and 44 of the Spanish Civil Code. The French authorities, in line with the precedent laid down by the Court of Cassation in its judgment of May 30, 1838 [22] —and with it the principal exponents of the doctrine— [23] maintain unanimously and consistently that the promise to marry is void in itself, as being contrary to the absolute liberty that should exist at the moment of marriage, and that this liberty constituted a principle of public order. The promise of marriage being void, it can not create a legal obligation and a claim for damages for a mere

[20] Muñoz Morales, in 1 *Anotaciones al Código Civil de Puerto Rico*, pp. 25–26, in commenting on the principal changes in the 1902 Revised Civil Code, points out: "Title IV of this Revised Code deals with *marriage*, and Ch. I contains a single section which defines it as a civil institution arising from a contract. Consequently, all provisions dealing with canonical marriage and provisions common to both forms under the Spanish Code are eliminated." Among those common provisions and both forms of marriage were §§ 43 and 44 of the Spanish Code.

For the text of the proposed revision concerning marriage and divorce, see *Report of the Committee to Revise and Compile the Laws of Puerto Rico*, Vol. II, Parts IV and V (1901), p. 633. For the Commentaries on that same revision—in which nothing is said about betrothal—see the report *supra*, Vol. I, pp. 201–203.

[21] Louisiana recognizes the promise of marriage as being a contract, and damages are recoverable under the provisions of § 1934 of its Civil Code—equivalent in part to our § 1059. *Morgan* v. *Yarborough*, 5 La. Ann. 316 (1850) ; *Smith* v. *Braun*, 37 La. Ann. 225; *Johnson* v. *Levy*, 118 La. 447, 43 So. 46. See, also, 24 Tulane L. Rev. 501 *et seq.*

[22] *Bouvier* v. *Contreau*, S. 1938, I. 492. Regarding the original text of this decision and commentaries thereon, see Capitant, *Les Grands Arrets de la Jurisprudence Civile*, 2d ed. Paris (1940), pp. 15–16. See, also, Brockelbank, *The Nature of the Promise to Marry—A Study in Comparative Law*, 41 Ill. L. Rev. 1, 24–25. Brockelbank's analysis on the state of the French law under this decision appears at pp. 19–23 of that article.

[23] 2 Laurent, *Principios de Derecho Civil*, Spanish version (1912), p. 452 *et seq.;* 2 Planiol–Ripert, *Derecho Civil Francés*, Spanish version (1939), p. 66 *et seq.;* 1 Colin y Capitant, Spanish version (1952), p. 310 *et seq.*

breach of promise cannot be predicated on § 1140 of the French Civil Code, equivalent to § 1054 of ours. Yet, it recognizes that the breach of promise could give rise to an action for damages whenever it is unjustified and results in actual prejudice to the other party. The action is not based, however, on the validity of the promise but on the existence of the injury inflicted, arising out of the promiser's fault, under § 1382 of the French Code—§ 1802 of ours.[24]

[21] According to the French courts, "the execution of a promise of marriage cannot by itself give rise to an action for damages, since 'it would encroach indirectly on the freedom to marry.' In other words, the future consent to contract the proposed marriage cannot be the object of an effective promise. The breach of this promise may only give rise to an indemnity for damages to the future deserted spouse whenever the former is accompanied by circumstances which render it a prejudicial fault." They maintain this view as "a juridical application of the provisions of § 1382 of the Civil Code which does not violate any of the principles of our law." Colin y Capitant, op. cit., p. 314.

"The prevailing theory of the decisions and the French doctrine is predicated on the fact that "marriage is not commercial and cannot be the object of an obligation to perform. As rightly stated by Laurent, 'a promise to marry is not a promise made by a debtor to his creditor.' Nor is the concept of precontract acceptable, since marriage is not only a pure contract but also an institution by which the spouses abide of their own free will." Planiol–Ripert, op. cit., p. 67.

"In rejecting the theory of the validity of the promise of marriage as a binding contract at civil law, the authorities have not intended to allow the offending party to remain immune to all reparation, whenever such breach is detrimental to the ex-fiancée. The same judgments which have rejected the payment of damages under § 1142 have applied §§ 1382 and 1383." Planiol–Ripert, op. cit., pp. 68–69.

"What constitutes the essence of this union [matrimony] from a legal point of view? The most absolute freedom at the act of the ceremony. Hence, the promise of marriage cannot create a legal tie; this means that it is not compulsory; consequently, it is void. In order to admit it, an express provision in the Code would be necessary; the silence of the latter is sufficient to render the promise invalid." Laurent, op. cit., p. 457.

On the strength of the foregoing principle, the authorities and the doctrine have established that "the fact alone of the nonperformance of the proposed marriage cannot by itself warrant a judgment for damages, since this would be, under a new form, an encroachment upon the freedom of marriage. If, therefore, a judgment for damages lies against one who breaks a promise to marry, such judgment cannot be based on an obligation derived from a contract. The true reason for so deciding is found in § 1382, according to which 'every act of man which causes injury to another obligates the one by whose fault it happened to repair

Our Code recognizes marriage as a civil institution: it is the family institution which constitutes the basic unit of society. In order for it to be formed, the execution of a marriage contract pursuant to legal provisions is required. That is its source; it recognizes no other. To be valid, mutual consent, among other requirements, is indispensable and the expression of consent must be made at the very act of the ceremony. By the rule of public policy, such consent must be freely expressed because it is in the interest of the government to preserve its basic social entity.

We follow, as more rational and conformable to our law,[25] the theory of the French law which denies legal force to the promise to marry, and which bases the action for damages, not on a contract—§ 1054—but on a culpable act of the promiser who has caused the damage—§ 1802.[26]

---

the injury.' Consequently, compensation for damages will lie against a person who commits a civil offense or a quasi-offense by breaking a promise of marriage. Such person is at fault, not because he made a promise, but because as a consequence of such promise the other party has suffered injury, either material or moral." Laurent, *op. cit.*, p. 463.

See, also, 1 Henri y Leon Mazeaud, *Tratado Teórico y Práctico de la Responsabilidad Civil*, Spanish version, pp. 61–62.

[25] In the Anglo-American common law the promise to marry is of the nature of a contract, and its breach gives rise to an action for damages. The public disfavor in the United States toward this type of actions has prompted a great number of states to enact legislation to abolish them. Brockelbank, *The Nature of Promise to Marry—A Study in Comparative Law*, 41 Ill. L. Rev. 1; Feinsigner, *Legislative Attack on "Heart Balm,"* 33 Mich. L. Rev. 979; Brown, *Breach of Promise Suits*, 77 U. of Pa. L. Rev. 474; Wright, *The Action for Breach of Marriage Promise*, 10 Va. L. Rev. 361; Cousens, *The Law of Damages as Applied to Breach of Promise of Marriage*, 17 Cornell L.Q. 367.

See, also, *Abolition of Actions for Breach of Promise, Enticement, Criminal Conversation and Seduction*, 22 Va. L. Rev. 205; *Physical and Mental Conditions as a Defense in Breach of Promise*, 83 U. of Pa. L. Rev. 998; *Avoidance of Incidence of Anti-Heart Balm Statutes*, 52 Col. L. Rev. 242.

[26] In the Philippine Is., where §§ 43 and 44 of the Spanish Civil Code, which was extended to those Islands, were abrogated as of December 31, 1889—*Benedicto* v. *De La Rama*, 3 Phil. Rep. 34—the Supreme Court has recognized the allowance of compensation for damages in this type of actions on the theory of fault—§ 1902 of the Civil Code of the Philippine Is., equivalent to § 1802 of our Code. *García* v. *Del Rosario* (1916), 33 Phil. Rep. 189, 193.

## IV

■ The basic requisites for determining the defendant's liability, pursuant to the general rules of civil liability, are, according to the applicable doctrine:[27] (1) the fault of the defendant, (2) injury to plaintiff, and (3) relation of cause and effect between the fault and the injury. The *fault* will consist of the unjustified breach, i.e., of the promise which has been violated without just cause. To that end the promise is not invoked as a *contract* but as an *act*. The compensable *injury* includes the material and the moral injury as well. And the *relation of cause and effect* must naturally arise from the culpable breach and the injury suffered.

## V

■■ We believe—in the light of the evidence introduced in the lower court—that the three basic elements above pointed out are present in the case at bar. The evidence warrants[28] a determination of culpable liability on defendant's part and damages to plaintiff as a direct consequence of an act of the former.

The conclusion reached by us as to the propriety and nature of the cause of action in the present case warrants the reversal of the judgment dismissing the complaint. We will not, however, remand the case to the trial court for further proceedings, since the findings of the lower court and the entire oral and documentary evidence before us place us in a position to make our own determination of damages.

The sum of $1,500 is awarded for the moral suffering and mental anguish, mortification, and humiliation before society. There is no evidence to warrant the allowance of

---

[27] Planiol Ripert, *op. cit.*, p. 70 *et seq.*

[28] The findings of fact made by the trial court do not embrace all those particulars which it would have been proper to include therein, had the action been regarded as one for damages predicated on § 1802 of the Civil Code.

538

the separate and special claims for "damage to her reputation before society" and "failure in her studies and prospects in life." The sum claimed for "failure in her economic expectancy based on the prospective marriage to the defendant, who was a person of solvent means," is not recoverable within this action. Laurent, *op.* and *tit. cit.*, p. 465.

For the reasons stated, the judgment will be reversed and another rendered instead sustaining the complaint and ordering the defendant to pay to plaintiff the sum of $1,500 for damages, the costs, and $300 for attorney's fees.

Mr. Justice Marrero concurs in the result.

Mr. Justice Pérez Pimentel did not participate herein.